# EXHIBIT A

| | |
|---|---|
| 1 | Joseph Sullivan (SBN 175984) |
| | WADE LAW GROUP |
| 2 | A Professional Corporation |
| | 262 East Main Street |
| 3 | Los Gatos, CA 95030 |
| | Telephone: (408) 842-1688 |
| 4 | Facsimile: (408) 549-1612 |
| | Email: jsullivan@wadelitigation.com |

**ELECTRONICALLY FILED**
Superior Court of California
County of Sacramento
**07/05/2024**
By: _____ B. Prasad _____ Deputy

5
6 Attorneys for Plaintiff
Dusty Stanaway

7

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              IN AND FOR THE COUNTY OF SACRAMENTO

10

| | |
|---|---|
| 11  DUSTY STANAWAY, an individual; | Case No.: 24CV013460 |
| 12          Plaintiff, | COMPLAINT FOR: |
| 13      vs. | 1) BREACHES OF CONTRACT; |
| 14  OXFORD GOLD GROUP, INC., a California | 2) BREACHES OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; |
| corporation; JOHNATHAN ADLER, an | 3) FRAUD; |
| 15  individual; PEDRAM GRANFAR, an | 4) UNJUST ENRICHMENT; |
| individual; EQUITY TRUST COMPANY, a | 5) NEGLIGENT |
| 16  South Dakota corporation; and DOES 1 to 50, | MISREPRESENTATIONS |
| inclusive, | |
| 17 | |
| 18          Defendants. | DEMAND FOR JURY TRIAL |

19

20

21          Plaintiff, DUSTY STANAWAY, hereby complains and alleges against Defendants as

22  follows:

23                          **INTRODUCTION**

24          1.      Defendants OXFORD GOLD GROUP, INC.; its Chief Financial Officer,

25  JOHNATHAN ADLER; and its Chief Executive Officer, PEDRAM GRANFAR; intentionally

26  defrauded Plaintiff out of a $115,239.22 investment, made for purchasing gold and silver.

27  Plaintiff is therefore entitled to compensatory and punitive damages, as pleaded herein.

28  ///

**THE PARTIES**

2.     Defendant OXFORD GOLD GROUP, INC. is, and at all times herein mentioned was, a California corporation, with its principal place of business in Sacramento County, California.

3.     Defendant JOHNATHAN ADLER is, upon information and belief, a resident of Sacramento County, California and is the Chief Financial Office and Secretary of OXFORD GOLD GROUP, INC.

4.     Defendant PEDRAM GRANFAR is, upon information and belief, a resident of Sacramento County, California and is the Chief Executive Officer of OXFORD GOLD GROUP, INC.

5.     Defendant EQUITY TRUST COMPANY is, and at all times herein mentioned was, a South Dakota corporation, with its principal place of business in Westlake, Ohio.

6.     Plaintiff DUSTY STANAWAY is, and at all times herein mentioned was, a resident of Gloucester County, Virginia.

7.     Plaintiff does not know the true names and capacities of DOES 1 to 50, inclusive; and therefore sues these defendants by such fictitious DOE names.  Plaintiff prays for leave to amend this Complaint to allege the DOE defendants' true names and capacities, when such information has been ascertained by Plaintiff.

8.     Plaintiff is informed and believes, and based thereon alleges, that each and all of the acts and omissions alleged herein, were performed by, or are attributable to, Defendants and DOES 1-50, each acting as the agent for the other, with legal authority to act on the others' behalf.  Upon information and belief, the acts of Defendants were in accordance with and represent the official policies of Defendants.

9.     At all times herein mentioned, upon information and belief, Defendants, and each of them, ratified each and every act or omission complained of herein.  And at all times herein mentioned, upon information and belief, Defendants, and each of them, aided and abetted the acts and omissions of each and all the other Defendants, proximately causing the damages herein alleged.

10.     Plaintiff is informed and believes, and based thereon alleges, that each of the Defendants are in some manner intentionally, negligently, or otherwise responsible for the acts, omissions, occurrences, and transactions alleged herein.

11.     Plaintiff is informed and believes, and based thereon alleges, that each of the Defendants knowingly and willingly conspired and agreed among themselves to undertake the unlawful actions and omissions alleged herein, in furtherance of the common design and scheme alleged herein.

## JURISDICTION AND VENUE

12.     Jurisdiction is proper as every Defendant is either a resident of California, is doing business within California, has engaged in conduct that was known or reasonably certain to cause harm in California; and/or entered into the contracts at issue in California.

13.     Plaintiff alleges damages in excess of and in no event less than $1,500,000.00.

14.     Venue is proper in Sacramento County, California, because at least one Defendant resides in Sacramento County, California.

## GENERAL ALLEGATIONS

15.     Plaintiff, Dusty Stanaway ("Plaintiff") entered into a written contract with OXFORD GOLD GROUP, INC., on November 21, 2023, per the advice of OXFORD GOLD GROUP, INC. employee, Todd Dutkevitch.  See the attached Exhibit 1 OXFORD GOLD GROUP TRANSACTION AGREEMENT.

16.     Plaintiff invested $115,239.22 of his IRA Account funds, into OXFORD GOLD GROUP, INC., on November 17 2023, via Defendant EQUITY TRUST COMPANY, per the attached Exhibit 2 Vanguard Voyager Services wire transfer statement, for the purpose of profiting from the OXFORD GOLD GROUP, INC. impending Exhibit 1 contract investment.

17.     In February, 2024, Plaintiff received the attached Exhibit 3, February 9, 2024 letter from Defendant EQUITY TRUST COMPANY.  The letter explains that Defendant EQUITY TRUST COMPANY used Plaintiff's IRA funds, to purchase gold from OXFORD GOLD GROUP, INC., for Plaintiff's benefit.

18.     The Exhibit 3 letter also explains that after purchasing the gold with Plaintiff's

funds, Defendant EQUITY TRUST COMPANY "ceased doing business with Oxford Gold"; and that OXFORD GOLD GROUP, INC. had not performed its obligation to transfer the gold purchased, to Plaintiff's benefit.

19.     Plaintiff then contacted OXFORD GOLD GROUP, INC.'s employee, Todd Dutkevitch and informed him that Plaintiff had lost confidence in OXFORD GOLD GROUP, INC. and therefore required a refund of the $115,239.22 invested.

20.     Mr. Dutkevitch then referred Plaintiff to Defendant JOHNATHAN ADLER and provided Defendant JOHNATHAN ADLER's phone number to Plaintiff.

21.     Defendant JOHNATHAN ADLER stated by email to Plaintiff, on February 22, 2024, that Plaintiff would receive a refund of his $115,239.22, in 5-7 business days.  That statement by Defendant JOHNATHAN ADLER, formed a contract between Plaintiff and Defendant Adler, due to Plaintiff's forbearance from suing Defendants OXFORD GOLD GROUP, INC. and Defendant JOHNATHAN ADLER, for breach of contract and fraud.

22.     Defendant JOHNATHAN ADLER breached the contractual promise to refund Plaintiff's invested money and committed fraud upon Plaintiff, because Defendant JOHNATHAN ADLER in fact did not intend to return the invested money, which still has not been returned as of the time of the filing of this Complaint.

23.     The fraudulent promise by Defendant JOHNATHAN ADLER to refund the money, was followed by many unanswered calls to Defendant JOHNATHAN ADLER, from Plaintiff, further evidencing fraudulent intent by Defendant JOHNATHAN ADLER.

24.     On March 8, 2024, Plaintiff contacted Defendant PEDRAM GRANFAR, by telephone.  Plaintiff explained the above described transactions and circumstances to Defendant PEDRAM GRANFAR, who promised Plaintiff that the $115,239.22 refund would be remitted between March 11, 2024 and March 15, 2024.

25.     That statement by Defendant PEDRAM GRANFAR, formed another contract between Mr. Stanaway and Defendant PEDRAM GRANFAR, which was breached by Defendant PEDRAM GRANFAR; and the promise also constituted actionable fraud, by Defendant PEDRAM GRANFAR.

26.     Mr. Dutkevitch also referred Plaintiff to OXFORD GOLD GROUP, INC.'s administrative assistant, Tiara Teruel, who after many unreturned phone calls, on March 21, 2024, advised Plaintiff that he would receive the full refund by the end of the month.  That contract was also breached by OXFORD GOLD GROUP, INC. and constituted more actionable fraud by that Defendant.

27.     On April 10, 2024, Defendant JOHNATHAN ADLER threatened to do bodily harm to Plaintiff, while on a phone call with him.  Defendant PEDRAM GRANFAR then took over the call and promised an "update" in 10 days, which never occurred.  These occurrences are more evidence of the fraudulent intent on the part of Defendants OXFORD GOLD GROUP, INC., JOHNATHAN ADLER and PEDRAM GRANFAR.

28.     On May 30, 2024, Plaintiff's attorney sent a demand letter to Defendants OXFORD GOLD GROUP, INC., JOHNATHAN ADLER and PEDRAM GRANFAR, demanding payment for damages in the amount of $145,992.50, by June 7, 2024, which Defendants never responded to.  Defendants' failure to respond shows their knowledge of their fraudulent conduct, their receipt of notice of their fraudulent conduct; and undue delay in paying damages for their fraudulent conduct.

29.     The May 30, 2024 demand letter advised Defendants OXFORD GOLD GROUP, INC., JOHNATHAN ADLER and PEDRAM GRANFAR that due to their fraud in inducing Plaintiff into the Exhibit 1 contract, Plaintiff was immediately exercising his right to void all provisions of the contract that he deemed unfavorable to him and enforcing all the contract provisions he deemed favorable to him.  For example, Plaintiff voided the contract provision for arbitration, but invoked his right to proceed against the Defendants in California Superior Court for all of his damages, including his attorney's fees and costs under the contract.

30.     Plaintiff has incurred damages due to Defendants' fraudulent conduct, in the amount of the $115,239.22 investment, plus the loss of use and increase in value of the gold that Defendants promised Plaintiff he would receive, plus interest and attorney's fees, in amounts to be proved at trial.

31.     Plaintiff is entitled to punitive damages, due to Defendants' despicable fraudulent

conduct.

## FIRST CAUSE OF ACTION

### Breaches of Contract

(Against all Defendants)

32.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 31 above, as though fully set forth herein.

33.    Defendants breached the contracts with Plaintiff as alleged above herein.

34.    As a proximate result of those breaches of contracts, Plaintiff has sustained damages in an amount to be proved at trial.

## SECOND CAUSE OF ACTION

### Breach of the Covenant of Good Faith and Fair Dealing

(Against all Defendants)

35.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 34 above, as though fully set forth herein.

36.    Every California contract contains an implied covenant of good faith and fair dealing.

37.    Defendants breached the implied covenants of good faith and fair dealing contained in the above referenced contracts with Plaintiff, as alleged herein.

38.    As a proximate result of those breaches of the implied covenants of good faith and fair dealing, Plaintiff has sustained damages in an amount to be proved at trial.

## THIRD CAUSE OF ACTION

### Fraud

(Against all Defendants)

39.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 38 above, as though fully set forth herein.

40.    The material representations made by Defendants, as alleged herein, were in fact false.  The true facts were that Defendants were engaged in a systematic effort of conspiratorial fraud against Plaintiff, in order to enrich themselves at Plaintiff's expense.

41.     When Defendants made the above described  representations and concealed the true facts from Plaintiff,  they knew their representations were false; and that their representations and actions were made with the intent to defraud and deceive Plaintiff; and with the intent to induce Plaintiff to enter into contracts and suffer damages.

42.     Plaintiff, at the times the above referenced representations occurred, was ignorant of the falsity of Defendants' representations and actions and Defendants' secret intentions. Moreover, Plaintiff believed the subject representations to be true and assumed Defendants were not engaging in criminal fraud.

43.     Plaintiff was induced to and did act in the manner described herein.  But had Plaintiff known of the actual intentions of Defendants, Plaintiff would not have entered into any contracts with Defendants.

44.     Plaintiff's reliance on Defendants' representations was justified because Defendants were executives and owners of a corporation.  Therefore Plaintiff justifiably assumed Defendants would act in a lawful manner in compliance with the law.

45.     As a proximate result of Defendants' fraud and deceit and the facts herein alleged, Plaintiff has been damaged in an amount to be determined at trial.

46.     Defendants JOHNATHAN ADLER and PEDRAM GRANFAR, have treated Defendant OXFORD GOLD GROUP, INC. as their alter ego and have used Defendant OXFORD GOLD GROUP, INC., to conduct illegal and fraudulent activities in the name of a corporation.

47.     As a result, the OXFORD GOLD GROUP, INC. corporate veil is pierced and JOHNATHAN ADLER and PEDRAM GRANFAR can and should be held personally liable for their fraudulent actions and for Plaintiff's resulting damages.

48.     In doing the acts herein alleged, Defendants acted with oppression, fraud, and malice, and Plaintiff is entitled to compensatory damages of no less than $150,000 and punitive damages of no less than $1,350,000, for total damages of no less than $1,500,000.

**FOURTH CAUSE OF ACTION**

**Unjust Enrichment**

(Against all Defendants)

49.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 48 above, as though fully set forth herein.

50.     Defendants have benefited from each of their acts alleged herein, and have benefited from the retention, use, investment and reinvestment of the benefits of those acts.  As a result, Defendants have been unjustly enriched to their benefit and to the detriment of Plaintiff.

51.     As a consequence of the foregoing unjust enrichment, Defendants have a duty to Plaintiff to account for and make restitution to Plaintiff of all monies and all benefits received or to be received, directly or indirectly, by such Defendants as a result of the retention, use, investment and reinvestment of Plaintiff's monies.

## SIXTH CAUSE OF ACTION

### Negligent Misrepresentation

(Against all Defendants)

52.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 51 above, as though fully set forth herein.

53.     The representations made by Defendants, as alleged herein, were in fact false. The representations made by Defendants were negligent in that they, as executives and owners of companies, should have known or had reason to believe that the misrepresentations made to Plaintiff would cause him to rely on those representations to his detriment and to Defendants' benefit.

54.     Plaintiff, at the times the above referenced representations occurred, was ignorant of the falsity of Defendants' representations and actions and of Defendants' negligence. Moreover, Plaintiff believed the representations to be true and assumed Defendants were not engaging in criminal fraud.

55.     Plaintiff was induced to and did act in the manner described herein.  But had Plaintiff known of the actual intentions of Defendants, Plaintiff would not have entered into any contracts with Defendants.

56.     Plaintiff' s reliance on Defendants' representations was justified because

1  Defendants were executives and owners of a corporation.  Therefore Plaintiff justifiably assumed

2  Defendants would act in a lawful manner in compliance with the law.

3       57.     As a proximate result of Defendants' actions and the facts herein alleged,

4  Plaintiff has been damaged in an amount to be proved at trial.

5  **PRAYER**

6       WHEREFORE, Plaintiff prays for judgment as set forth below against Defendants herein,

7  and each of them, as follows:

8       1.     For direct and consequential damages according to proof;

9       2.     For compensatory damages according to proof;

10       3.     For punitive damages according to proof;

11       4,     For prejudgment interest as allowed by law;

12       5.     For reasonable attorneys' fees and expenses according to proof;

13       6.     For costs of suit herein; and

14       7.     For all further relief as the Court may deem just and proper.

15

16  Dated: July 5, 2024               WADE LAW GROUP

17                                 A Professional Corporation

18

19                   By: _____

20                         Joseph Sullivan

                             Attorneys for Plaintiff

                             Dusty Stanaway

21

22

23

24

25

26

27

28

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury as to all of the causes of action in Plaintiff's Complaint.

Dated:  July 5, 2024

WADE LAW GROUP
A Professional Corporation


By: _____
Joseph Sullivan
Attorneys for Plaintiff
Dusty Stanaway

# EXHIBIT 1

## OXFORD GOLD GROUP TRANSACTION AGREEMENT

Customer Name: **Dusty Stanaway**

Street Address: **1987 Ward Court**

City, State, Zip Code: **Gloucester Point**          **VA**          **23072**

Phone Number: **804-695-7091**

Email Address: **dustydale3@aol.com**

### Do Not Call Registry Waiver

Customer hereby expressly authorizes Oxford Gold Group, Inc. ("OGG") to telephone Customer at the number Customer has provided or provides in the future, regardless of whether or not the telephone numbers appear in the "National Do Not Call Registry" or any state equivalent. This authorization shall remain effective unless and until Customer informs OGG otherwise. **You are not obligated to pay unless you sign this Agreement and return it to Oxford Gold Group.**

Dated: **11/21/2023 | 3:04 PM PST**  Customer's Signature:

**OXFORD GOLD GROUP, INC.** (and/or its affiliates) (collectively, "OGG") and **CUSTOMER** agree, subject to Paragraph 11, that the terms set forth in this Transaction Agreement ("Agreement") shall govern all transactions (purchase or sale, pending and future) between the parties involving Precious Metals. "Precious Metals" shall mean, for purposes of this Agreement, any precious metal in any form or quantity.

**Important Notice: This Agreement contains a binding, individual arbitration agreement and class waiver. This means that any claim must be arbitrated on an individual basis pursuant to the terms set forth below; claims of different persons cannot be combined or aggregated, and both Customer and OGG are waiving the right to file a lawsuit in Court and to have a jury decide the dispute.**

1.      **Payment; All Sales Final:** Customer must deliver funds sufficient to pay for any purchase within five (5) business days of Customer's placement of the order ("Purchase Funds"). With the limited exception(s) noted in **Paragraph 8a and the addendum (if applicable; certain states only), all sales are final (i.e., the Precious Metals purchased cannot be exchanged or returned for a refund).** Orders placed but not paid for are subject to a liquidation fee (detailed in Paragraph 4).

2.      **Delivery of Precious Metals (Non-IRA Transactions):** Unless otherwise agreed in writing, OGG shall cause all Precious Metals purchased to be delivered to Customer's address, as set forth above. OGG shall deliver the Precious Metals ordered to a nationally recognized delivery service for delivery to Customer no more than twenty-eight (28) days after OGG verifies that Customer's Purchase Funds are backed by good funds. (Note: It may take longer to verify personal checks.) OGG only uses reputable, nationally recognized delivery services. Nevertheless, if Customer's order is lost prior to delivery, Customer should notify OGG, in writing, immediately, at the following address and/or telephone number.

**Oxford Gold Group, Inc.,**
**Attention: Customer Service**
**9100 Wilshire Blvd., Suite 800E, Beverly Hills, CA 90212**
**1-833-327-9472**

If the delivery service verifies that Customer's Precious Metals were never delivered, OGG shall, within forty-five (45) days of such verification, in its sole discretion, either refund to Customer the full purchase price for the undelivered Precious Metals or replace such Precious Metals with other substantially similar Precious Metals.

Risk of loss passes upon delivery; OGG assumes no responsibility for any Precious Metals lost after delivery to Customer(in the case of a purchase by Customer) or prior to delivery to Oxford (in the case of a purchase from Customer).

**3.     Purchase Price:**

(a)     **Sales:** The purchase price Customer has been quoted and agreed to pay for any Precious Metals includes OGG's profit margin (or fee) on the transaction. Within the Precious Metals industry, the difference between OGG's cost for the Precious Metal, and the retail price quoted to Customer, is known as the "Spread."

Spreads vary significantly by Precious Metal, by customer, and over time. The price OGG charges when it sells Precious Metals is higher than the price OGG would pay, at the same moment in time, to purchase (or buyback) the same Precious Metals from a customer. The sale and buyback prices are not the same because the sale price must cover OGG's operating expenses (for example, rent, salaries, marketing expenditures) and OGG's profit. OGG, by contrast, does not generally make any profit and does not generally try to recoup any operating expenses on buyback transactions; in buyback transactions, OGG's general practice (which is subject to change) is to pay Customer the price it is quoted to immediately wholesale/sell such Precious Metals (at the time the sale to Oxford by Customer is confirmed.)

For Customer to make a profit, Customer's Precious Metals must appreciate enough to cover this Spread (or differential). Spreads may be subject to negotiation, and any Spread charged to Customer in a specific transaction may be more or less than the Spread charged to others in similar transactions or charged to Customer in prior or future transactions.

At the time this Agreement was transmitted for Customer's signature, (i) OGG's Spread on bullion (as classified by OGG) was generally between three percent and fifteen percent (3% to 15%), and (ii) OGG's Spread on semi-Numismatic and Numismatic coins and bars (as classified by OGG) was generally between fifteen percent and thirty-three percent (15% to 33%). These numbers, however, are only general ranges and approximations, which are subject to change. Further, OGG's classification is based on OGG's own classification standards and decision-making; other sellers may classify the same item differently for pricing purposes. The actual Spread on any particular transaction could be any amount within the referenced ranges (or even possibly outside those ranges).

For example, if a bullion coin or bar was quoted by OGG at $400 and included a ten percent (10%) spread, OGG's cost for the bullion coin or bar would be $360. Similarly, if OGG quoted a Numismatic coin or bar at $400, which included a twenty-five percent (25%) spread, OGG's cost for that coin would be $300. Thus, in this example, the buyback price for the Precious Metal would need to appreciate to above $400 to make a profit. OGG's Spread range may be different (higher and/or lower), and the Spread OGG charges may be higher or lower, at the time of and for any given transaction. If you would like to know the Spread on your proposed transaction, please ask your OGG representative.

(b)     **IRA Sales:** OGG's pricing and spreads are the same whether Precious Metals are purchased for direct possession or placement in an individual retirement account.

(c)     **Re-purchases:** The law prohibits OGG from guaranteeing to repurchase the Precious Metals OGG sells, and OGG does not guarantee that it will re-purchase any Precious Metals that Customer purchases. However, as of the date of the transmission of this Agreement, OGG has never refused the opportunity to re-purchase Precious Metals that a customer purchased from OGG. If you wish to sell your Precious Metals in the future, please contact OGG for current buyback (repurchase) pricing. Any OGG repurchase offer may be raised or lowered on a daily, even hourly or more basis, depending upon market conditions, among other factors.

(d)     **Quotes on Customer's Holdings:** Customers may request a quote on their holdings at any time. When requesting a quote, please specify whether you are looking to purchase additional Precious Metals or sell your existing holdings, as OGG's buyback (buy from customer) and ask (sell to customer) quotes will vary.

(e)     **Classification as Bullion, semi-Numismatic, or Numismatic:** Whether a Precious Metal is classified as Bullion, semi-Numismatic, or Numismatic may turn on a number of objective and subjective factors, including the age of the Precious Metal, its condition, the number of known copies, the likelihood of additional minting, the originating country, relevant historical events or owners (e.g., shipwreck; royalty), relevance to the formation of various Precious Metal collections, and an investor's personal attraction to the piece. OGG's classification of Precious Metals is only an opinion and may change over time (e.g., if additional quantities of the Precious Metal are discovered). In addition, given the subjective nature of the classification process, other dealers or investors may classify the same coin differently.

(f)     OGG's prices and spreads are based on its classification determination.

4.     **Remedy for Customer's Failure to Perform:** If Customer refuses to accept delivery of the Precious Metals ordered or fails to make payment when due, OGG, in its sole discretion, may cancel the transaction and resell such Precious Metals on a wholesale basis. If the proceeds from such resale are less than the contract price with Customer, OGG shall be entitled to recover from Customer the difference between the resale price and Customer's contract price, plus any incidental damages occasioned by Customer's breach. In lieu of the proceeding provision, at OGG's sole option, OGG may charge a flat 4% restocking or liquidation fee on the total price of Customer's transaction.

5.     **Investment Objectives; Holding Period; Investment Risk; No Advice; Commissioned Sales Representatives:**
(a)     OGG is a seller and purchaser of Precious Metals, nothing more. OGG is not an investment advisor, financial advisor, or retirement account fiduciary, and does not provide legal or tax advice, retirement planning or retirement specific opinions/ information.

(b)     Customer agrees that (i) **no fiduciary relationship exists between OGG and Customer**, (ii) the decision to purchase or sell Precious Metals, and which Precious Metals to purchase or sell, are the Customer's decision alone, and (iii) purchases or sales are made subject to Customer's own research, prudence and judgment. Customer further acknowledges that retirement needs vary and are highly individual in nature, and that the general information provided by OGG may not take into account Customer's specific retirement or investment needs.

(c)     In OGG's opinion, Precious Metals should be considered a long-term investment. Customer should be prepared to hold any Precious Metals purchased whether from OGG or elsewhere for at least a three (3) to five (5) year period, and preferably five (5) to ten (10) years, to maximize the potential for gains. Customers who do not hold their Precious Metals for a lengthy period of time are unlikely to see their Precious Metals appreciate enough to cover the Spread, resulting in a loss. In OGG's opinion, Customer should only invest capital that can be held for at least this period of time. Precious Metals, like all investments, carry capital risk. Precious Metals may appreciate, depreciate, or stay the same depending on a variety of factors. OGG cannot guarantee, and makes no representation, that the Precious Metals will appreciate at all or appreciate sufficiently to make Customer a profit at the expiration of this or any other period of time.

(d)     In OGG's opinion, Customer should not invest more than twenty percent (20%) of Customer's available investment funds in Precious Metals. Moreover, Precious Metals do not yield income.

(e)     The success of an investment in Precious Metals is dependent, in part, upon extrinsic economic forces including but not limited to supply, demand, international monetary conditions, and inflation or the expectation of inflation. The impact of these forces on the values of Precious Metals in general or any particular Precious Metal cannot be predicted. Customer acknowledges that the Precious Metals market can be volatile and that Precious Metal prices may rise or fall overtime. Customer further acknowledges that past performance is no guarantee of future performance.

(f)     Any written or oral statements by OGG, its officers, agents, sales representatives, or other representatives relating to future events or the attributes of certain Precious Metals are opinions only. Such statements, if any, are not representations of fact.

(g)    OGG's sales representatives are commissioned salespersons i.e., their salary is based, at least in part, on the amount and profit margin of the Precious Metals they sell. In addition, from time to time, OGG's sales representatives may receive other compensation tied to sales activity e.g., sales contests; bonuses tied to the sale of certain denominations/types or grades of Precious Metals.

OGG's sales representatives are not licensed, and their knowledge of Precious Metals and the Precious Metals marketplace varies markedly.

OGG makes no representations regarding the tax consequences of holding Precious Metals as an investment in an IRA. Customer expressly acknowledges that Customer has been advised to seek independent tax advice, from a qualified professional, regarding the tax consequences of such an investment.

6.    **Grades**:
(a)    OGG is not a grading service. OGG purchases Precious Metals for re- sale to its customers. OGG is not a grading service. OGG does not independently assess the graded Precious Metals it purchases for resale but relies upon the opinions and assessments of independent grading services such as Professional Coin Grading Service, Inc., Numismatic Guaranty Corporation of America, and ANACAS. Grading is a subjective process, and it is not uncommon for grading services, or individual examiners within the same grading service, to reach different conclusions regarding the appropriate grade for a particular Precious Metal.

Moreover, grading standards are constantly evolving. OGG does not guarantee that the graded Precious Metals it sells will achieve the same grades in the future. In selling graded Precious Metals, OGG warrants that the Precious Metal is genuine (i.e., not a counterfeit) and states that the grade is as opined by the grading service when graded by that service.

(b)    **Grading is subjective.** Grading is a subjective determination. While numerical grading may give the impression of precision, the numbers in fact represent a nuanced opinion that even experts cannot consistently and systematically agree upon. The grade reflects the opinion of the cataloger (or grader) as to the state of preservation, method of strike, and overall appearance of a particular Precious Metal or lot.

7.    **Representation/Warranty; Sales Representatives Not Authorized To Make Other Representations or Warranties:** OGG represents and warrants that, upon the delivery of Purchase Funds (as provided for in Paragraph 1), and subject to the other terms and restrictions set forth in this Agreement, OGG will cause to be delivered to Customer the denomination/type and grade of Precious Metals specified in Customer's order, as classified and/or graded (if applicable) by one of the following independent grading services: Professional Coin Grading Service, Inc. (PCGS), Numismatic Guaranty Corporation of America (NGC), ANACAS, or any other independent grading service of similar standing. The only representation and warranty that Customer may rely upon in purchasing Precious Metals from or selling Precious Metals to OGG is the representation set forth in this Paragraph 7. Neither OGG, nor any of its officers, agents, employees, sales representatives, or other representatives are authorized to make any other representations or warranties concerning any Precious Metals that OGG is selling or purchasing under this Agreement.

8.    **Refund Policy:**
(a)    Replacement of Semi-Numismatic or Numismatic Coins Where Grade Disputed: Customer agrees to inspect each delivery carefully upon receipt. If, for any reason whatsoever, Customer is dissatisfied with the quality of a **semi- Numismatic or Numismatic coin or bar** (specific kinds of Precious Metals) purchased from OGG, Customer should immediately notify OGG. If Customer notifies OGG of its dissatisfaction within fifteen (15) days of delivery of the semi-Numismatic or Numismatic coin or bar and the original holder in which the semi-Numismatic or Numismatic coin or bar in question was delivered has not been opened, removed, or tampered with in any respect, OGG shall replace the semi-Numismatic or Numismatic coin or bar in question with another semi-Numismatic or Numismatic coin or bar (as appropriate) of the same denomination/type and grade. If OGG determines, in its sole discretion, that another semi-Numismatic or Numismatic coin or bar of the same denomination, type and grade is not reason-ably, commercially available, OGG may elect, at its sole option, to either (i) replace the semi-Numismatic or Numismatic coin or bar purchased with a reasonably comparable semi-Numismatic or Numismatic coin or bar, even though of a different

denomination, type and grade, or (ii) cancel the transaction and return Customer's Purchase Funds. If OGG cancels the transaction, Paragraph 4 will apply.

**(b)** With the exception noted in Paragraph 8a and the Addendum attached hereto (certain state residents only), **ALL SALES ARE FINAL (i.e., the Precious Metals purchased cannot be exchanged or returned for a refund).**

**9. Disclaimer of Express and Implied Warranties: EXCEPT AS SET FORTH IN PARAGRAPH 7, THE PRECIOUS METALS SOLD BY OGG PURSUANT TO THIS AGREEMENT ARE SOLD ON AN "AS IS" BASIS AND OGG MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AND SPECIFICALLY DISCLAIMSANY WARRANTY OF MERCHANTABILITY AND OR FITNESS FOR A PARTICULAR PURPOSE.**

**10. No Liability for Consequential Damages; Limitation of Liability: IN NO EVENT SHALL OGG HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN TORT, CONTRACT, WARRANTY, OR OTHERWISE, AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE, OR STRICT LIABILITY), FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES SUSTAINED OR ARISING FROM OR RELATED TO ANY TRANSACTION COVERED BY THIS AGREEMENT, EVEN IF OGG IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, OGG'S LIABILITY TO CUSTOMER FOR ANY REASON AND UPON ANY CLAIMS SHALL AT ALL TIMES BELIMITED TO THE AMOUNT ACTUALLY PAID BY CUSTOMER FOR THE PRECIOUS METALS IN DISPUTE.**

11. **Application to Future Transactions:** This Agreement shall control all transactions between OGG and Customer unless and until such time as it is amended by OGG. Customer agrees that OGG may amend this Agreement at any time and from time to time, that OGG may give notice to Customer of any amendment by mailing a copy of the amended Agreement to the address set forth above (or any updated address provided by Customer inthe interim), and that following such mailing, the amended Agreement shall govern succeeding transactions andinteractions with OGG.

12. **Force Majeure:** Neither OGG nor Customer shall be liable for any failure or delay in its or their performance under this Agreement due to any cause beyond its or their respective reasonable control, including acts of war, terrorism,acts of God, earthquake, flood, embargo, riot, sabotage, labor shortage or dispute, governmental act or failure of the Internetincluding, but not limited to, any disruption, failure and/or error in or of OGG's internal computer systems, or any disruption, failure and/or error in or of any third-party Internet service providers as OGG may use from time to time.

13. **Dispute Resolution; Arbitration of Disputes; Class Action Waiver.** This Agreement contains a binding, individual arbitration agreement and class waiver. This means that any claim must be arbitrated on an individual basis pursuantto the terms set forth below; claims of different persons cannot be combined or aggregated, and both Customer and OGG are waiving the right to file a lawsuit in Court and to have a jury decide the dispute. **Please read this section carefully.**

(a) Prior to initiating arbitration, any party hereto asserting a Dispute (defined in Paragraph 13(c) below), shall send a written statement to the other party describing with reasonable particularity the Dispute and the relief requested (the "Demand"). The parties shall attempt in good faith to resolve any such Dispute promptly via direct negotiation (between the parties and retained counsel, if any) over a period of fifteen (15) days.

(b) If the direct negotiations specified in Paragraph 13(a) fail, prior to initiating arbitration, the parties shall conduct a one-day mediation regarding the Dispute. The parties shall mutually agree on a mediator associated with JAMS to conduct the mediation in Los Angeles, California. Ifthe parties are not able to mutually agree on a mediator within twenty-five (25) days of service of the Demand, then either party (or the parties jointly) may request the appointment of a mediator, and JAMS shall appoint a retired judge to serve as the parties' mediator. The cost of the mediator, including any administrative fee, for a one-day mediation shall be split by the parties. If and only when this pre-dispute process is exhausted without resolution of the Dispute, may the purportedly aggrieved party proceed to file a

demand for arbitration. (If the pre-filing mediation requirement and/or the obligation to split the cost set forth in this Paragraph 13(b) would render the agreement to arbitrate set forth in Paragraph 13 illegal or invalid, the pre-filing mediation requirement shall be void and of no further effect, and either Party may proceed to pursue their complaint immediately in arbitration.)

(c)     **ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE BREACH, TERMINATION, ENFORCE-MENT, INTERPRETATION OR VALIDITY THEREOF, INCLUDING THE DETERMINATION OF THE SCOPE OR APPLICABILITY OF THIS AGREEMENT TO ARBITRATE, OR ANY OTHER DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF ANY INTERACTION BETWEEN OGG AND CUSTOMER ("DISPUTE), SHALL BE BROUGHT AND BE DETERMINED BY FINAL, BINDING ARBITRATION IN LOS ANGELES, CALIFORNIA, BEFORE ONE ARBITRATOR.** Notwithstanding the immediately preceding sentence, if the JAMS Rules or any applicable JAMS Minimum Standards require it, or the Arbitrator concludes that it would be a financial or other hardship for Customer to participate in an arbitration in Los Angeles, the Arbitrator has the authority to hold the hearing, or any part thereof, in Los Angeles, California, or to permit Customer to attend via videoconference, Skype, Facetime, telephonic or similar virtual participation.

(d)     **THE ARBITRATION SHALL BE ADMINISTERED BY JAMS PURSUANT TO ITS ARBITRATION RULES.** These rules may be found at https:// www.jamsa-dr.com/adr-rules-procedures/. If the arbitration proceeds in Customer's county of residence (instead of Los Angeles), and there are no JAMS arbitrators or an insufficient number of JAMS arbitrators in the jurisdiction (or another jurisdiction willing to serve in such location), and the Parties are unable to agree on an arbitrator themselves, then a different arbitral association shall be selected by JAMS to conduct the arbitration.

(e)     CUSTOMER AND OGG WAIVE THEIR RIGHTS, IF ANY, TO BRING ANY CLAIM THAT IS SUBJECT TO THIS ARBITRATION PROVISION AS A CLASS ACTION OR OTHERWISE ON A REPRESENTATIVE BASIS. JUDGMENT ON ANY AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION. THIS CLAUSE SHALL NOT PRECLUDE PARTIES FROM SEEKING PROVISIONAL REMEDIES IN AID OF ARBITRATION FROM A COURT OF APPROPRIATE JURISDICTION. In the event this provision is held unenforceable, and the matter is permitted to proceed in Arbitration as a class or representative action, then the entirety of this Paragraph 13 (including all subparts) shall be void and of no further effect, and either Party may proceed to pursue the action in court.

(f)     The parties shall maintain the confidential nature of the arbitration proceeding and the award, including the hearing, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a preliminary remedy, confirmation and enforcement proceedings or a judicial challenge to an award or its enforcement, or unless otherwise required by law or judicial decision. The parties agree that breach of this confidentiality provision would irreparably harm the non- breaching party, and further agree that any such breach shall entitle the non- breaching party to seek injunctive relief and/or compensatory damages for the breach (without the necessity of posting a bond).

14.     **Choice of Law; Individual and Class Claims:** The internal, substantive law of California shall govern all individual claims brought by or against OGG in connection with this Agreement or otherwise arising out of any interaction between OGG and Customer (i. e., California's conflict of law principles will not apply).

15.     **Prevailing Parties.** In the event of any Dispute, and whether such Dispute is resolved via arbitration, litigation or otherwise, the prevailing party (as that term is commonly defined by the prevailing common and/or statutory law in the applicable jurisdiction) shall be entitled to recover its costs of suit, and which costs shall be specifically defined to include all reasonable attorneys' fees incurred by the prevailing party related to the Dispute.

16.     **Limitation on Time to Bring Any Claim:** Except where the law prescribes a shorter applicable statute of limitation, or prohibits shortening the otherwise applicable longer statute of limitations, any claim or legal

action of any kind arising in connection with or relating in any way to purchases from or sales to OGG or any other conduct of OGG, must be brought within one (1) year after the purchase or sale or other event giving rise to the claim or legal action. If this clause is determined to be unenforceable as to any particular claim or claims under the law of the applicable jurisdiction, it shall remain fully enforceable as to all other claims.

17.     **Jurisdiction:** Jurisdiction and venue for any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, or any other interaction between OGG and Customer, shall be in Los Angeles, California, and any party making a claim against OGG in whatever form hereby submits to personal jurisdiction in that forum for any and all purposes.

18.     **Finality; Integration Clause:** This Agreement is intended by OGG and Customer as a final expression of their agreement concerning the matters set forth herein and is also intended as a complete and exclusive statement of the terms of their agreement. This Agreement supersedes any oral or written statements made prior to, contemporaneous with, or in the future regarding this Agreement or the transactions covered hereunder. Customer shall not rely upon any statement made by or on behalf of OGG that is inconsistent with this Agreement.

19.     With the exception of Section 13(e) which is of essence to the agreement to arbitrate and is separately, more specifically addressed, if any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect.

**By signing below, I acknowledge that I have read, understand, and hereby agree to the terms set forth in this Agreement.**

Customer Name:  Dusty Stanaway

Dated:  11/21/2023 | 3:04 PM PST  Customer's Signature:

# ADDENDUM OF STATE-SPECIFIC PROVISIONS

Customer Name: __Dusty Stanaway__

Street Address: __1987 Ward Court__

City, State, Zip Code: __Gloucester Point__       __VA__       __23072__

**Initial** **By signing below beneath the paragraph for the state in which you live, I acknowledge that I have read, understand, and hereby agree to the terms set forth in this Addendum as they relate to my state of domicile.**

**Initial** **Neither OGG's Transaction Agreement nor this Addendum disclaims oral representations where state statutes disallow such disclaimers.**

Oxford Gold Group, Inc. (and its affiliates) (collectively, "OGG") and Customer agree, subject to the provisions in the Transaction Agreement set forth in Paragraph 11, that the following terms shall govern the pending and all future transactions between the parties involving Precious Metals[1].  This Addendum applies to purchases from and salesto OGG, and the warranties and certifications are intended to be applicable to pending as well as future transactions with OGG

✎ **Please sign beneath the paragraph for the state in which you live after reviewing that paragraph and its terms.**

**Alabama; Connecticut; Florida; Kansas**
The customer may obtain a full refund for the return of undamaged and unused merchandise to OGG within seven days of receipt[2] by the customer. Returns shall be made to Oxford Gold Group, Inc., Attention: Customer Service 9100 Wilshire Blvd., Suite 800E, Beverly Hills, CA 90212. OGG will process the refund within thirty days of receipt of the returned merchandise.

Signature: _____   Date: _____

**Alaska; Nebraska**
OGG will give the customer a refund, credit, or replacement, at the option of the customer, if: (1) the property or services purchased from OGG Capital are defective, not as represented, or not received as promised by OGG Capital; (2) within seven days after receiving the purchased property, the Customer returns the purchased property and makes a written request for the refund, credit, or replacement; or (3) within seven days after paying for the purchased services and before the services are provided, the Customer makes a written request for the refund or credit. Purchased property must be returned in the same condition as when delivered in order to be entitled to a refund, credit, or replacement. Returns of purchased property and written requests should be sent to: Oxford Gold Group, Inc., Attention: Customer Service 9100 Wilshire Blvd., Suite 800E, Beverly Hills, CA 90212.

Signature: _____   Date: _____

---

[1] "Precious Metals" shall mean, for purposes of this Transaction Agreement, any precious metal, in any form, that is the subject of a transaction between OGG and Customer,and shall include, but is not limited to, bullion bars and coins, semi-Numismatic coins and bars, Numismatic coins andbars, "junk silver", and bags (and partial bags) of coins.
[2] "Receipt" / "Delivery" of merchandise is considered to occur on either: (1) the date that the customer received actual possession of the merchandise; or (2) the date that the customer received written confirmation that the merchandise has been deposited in the customer's name in an independent depository as previously directed in writing by the customer.

**Arizona; Louisiana**
**Notice of Buyer's Right of Cancellation**: The customer may cancel this order without any penalty or obligation within three business days from the delivery* of the merchandise. If the customer cancels, any payments made by the customer will be returned within ten days after the receipt by the seller of the customer's notice of cancellation. To cancel this transaction, mail or deliver a signed and dated copy of your cancellation notice or send a telegram to: Oxford Gold Group, Inc., Attention: Customer Service 9100 Wilshire Blvd., Suite 800E, Beverly Hills, CA 90212. Any merchandise delivered to the customer must be returned at OGG's expense to the address listed above, no later than twenty-one business days after the receipt of the merchandise.

Signature: _____   Date: _____

**California**
**Notice of Buyer's Right of Cancellation**: A customer making a purchase from OGG may cancel the sale up to midnight of the third business day after signing the Transaction Agreement, or until midnight of the fifth business day if the customer is 65 years of age or older. Transactions shall be cancelled by mailing a notice of cancellation to: Oxford Gold Group, Inc., Attention: Customer Service 9100 Wilshire Blvd., Suite 800E, Beverly Hills, CA 90212. The customer shall return the merchandise, if applicable, to OGG within seven (7) days of exercising the right to cancel. Returns should be made to the address listed above. OGG will provide a full refund within 10 days of return of the merchandise, if merchandise has been delivered to the customer.

Signature: _____   Date: _____

**Colorado; Oklahoma**
The customer may obtain a full refund for the return of undamaged and unused merchandise to OGG, provided that the customer provides notice of cancellation, in writing, to OGG within three days after receipt* of the merchandise by the customer. Notice of cancellation and returns shall be made to: Oxford Gold Group, Inc., Attention: Customer Service 9100 Wilshire Blvd., Suite 800E, Beverly Hills, CA 90212. OGG will process the refund within thirty days of receipt of the returned merchandise.

Signature: _____   Date: _____

**Delaware; Hawaii; Montana; Ohio; West Virginia**
The customer may obtain a full refund for the return of undamaged and unused merchandise to OGG, provided that the customer provides notice of cancellation, in writing, to OGG within seven days after receipt* of the merchandise by the customer. Notice of cancellation and returns shall be made to: Oxford Gold Group, Inc., Attention: Customer Service 9100 Wilshire Blvd., Suite 800E, Beverly Hills, CA 90212. OGG will process the refund within thirty days of receipt of the returned merchandise.

Signature: _____   Date: _____

... Continued on next page

**Idaho; Michigan; New Mexico; New York; Washington**

The customer may cancel this transaction, without any penalty or obligation whatsoever, within three business days of the date in which they receive the written confirmation. If the customer cancels, all payments or other consideration which may have already been made will be returned by OGG within ten business days following receipt by OGG of the cancellation notice. The customer must return the goods to OGG at the OGG's risk and expense within twenty-one days of the date the refund is received by customer or the date of the cancellation, whichever is later. To cancel this transaction, deposit in the mail or deliver a signed and dated copy of this cancellation notice or any other written notice to: Oxford Gold Group, Inc., Attention: Customer Service 9100 Wilshire Blvd., Suite 800E, Beverly Hills, CA 90212,not later than midnight of the third business day after which you received this notice.

Signature: _____  Date: _____

**North Dakota**

The consumer may receive a full refund for the return of undamaged and unused goods if the consumer requests a refund no later than fifteen days after the date the consumer receives the goods Returns shall be made to Oxford Gold Group, Inc., Attention: Customer Service 9100 Wilshire Blvd., Suite 800E, Beverly Hills, CA 90212. OGG will process the refund within thirty days of receipt of the returned merchandise.

Signature: _____  Date: _____

**Pennsylvania; Vermont**

The customer may obtain a full refund for the return of undamaged and unused goods if returned to OGG within ten days after receipt* by the customer. Returns shall be made to: Oxford Gold Group, Inc., Attention: Customer Service 9100 Wilshire Blvd., Suite 800E, Beverly Hills, CA 90212. OGG will process the refund within thirty days of receipt of the returned merchandise.

Signature: _____  Date: _____

**Texas**

If the customer makes a purchase using a credit card, the customer may obtain a full refund for the return of undamaged and unused merchandise to OGG within seven days of receipt* by the customer. Returns shall be made to: Oxford Gold Group, Inc., Attention: Customer Service 9100 Wilshire Blvd., Suite 800E, Beverly Hills, CA 90212. OGG will process the refund within thirty days of receipt of the returned merchandise.

Signature: _____  Date: _____

**Utah**

A customer making a purchase from OGG may cancel the sale up to midnight of the third business day after the receipt* of the merchandise. Sales shall be cancelled by mailing a notice of cancellation to: Oxford Gold Group, Inc., Attention: Customer Service 9100 Wilshire Blvd., Suite 800E, Beverly Hills, CA 90212. The customer shall return the merchandise to OGG within seven (7) days of exercising the right to cancel. Returns should be made to the address above. OGG will provide a full refund within 30 days of return of the merchandise, if merchandise has been delivered to the customer.

Signature: _____  Date: _____

**Virginia**

The customer may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction, which date shall be the date the customer signs this Addendum to Shipping and Transaction Agreement. See the attached notice of cancellation form for an explanation of how to exercise this right. Notice and returns of merchandise, if any has been received by the customer, shall be sent to: Oxford Gold Group, Inc., Attention: Customer Service 9100 Wilshire Blvd., Suite 800E, Beverly Hills, CA 90212. Upon receipt of the notice of cancellation or return of merchandise, if any has been received, OGG will issue a full refund within ten (10) business days.

Signature: _____ Date: _11/21/2023_ | 3:04 PM PST

---

*{Buyer's Rights Described Above}*

*Notice of Cancellation*
*I have read the above relevant paragraph and wish to cancel my transaction dated _____ per the terms of the relevant paragraph.  I understand I must meet the terms of the relevant paragraph for this cancellation to be effective.*

*Signature:* _____ *Date:* _____

Oxford Gold Group, Inc., Attention: Customer Service 9100 Wilshire Blvd., Suite 800E, Beverly Hills, CA 90212

---

**INITIAL**

*\*\*State registration numbers, where applicable, are available upon request.*

EXHIBIT 2

November 17, 2023          **Page 1 of 3**

# Vanguard®

Do Not Use For Account Transactions
PO BOX 3009
MONROE, WI 53566-8309

**Connect with Vanguard**® > vanguard.com

**Vanguard Voyager Services**®

800-284-7245

DUSTY STANAWAY
P O BOX 14
YORKTOWN VA 23690-0014

## Traditional IRA brokerage account — 88763136
**DUSTY STANAWAY**

## Brokerage transaction confirmation

Please review this confirmation and contact us immediately if the information isn't correct. All transactions are in your cash account unless otherwise indicated. Notes, if applicable, are listed following the final transaction entry.

**Sweep Program**

Activity in your Sweep Program that generated a confirmation is displayed below.

| Trade date | Transaction | Amount |
|---|---|---|
| 11/17/2023 | Wire transfer to CITIBANK, NA ****5210 | $115,239.22 |

© 2023 The Vanguard Group, Inc. All rights reserved.

# Vanguard®

## Terms and conditions

Securities purchased on a cash or margin basis are, or may be, pledged under circumstances which will permit the commingling thereof with securities carried for other customers, but such securities, if pledged, will be withdrawn from lien as soon as practicable after receipt of payment therefore.

If this transaction is a purchase by you in a cash account and sufficient funds aren't already in your account with us, it's agreed that you'll make full payment for the securities described on this confirmation promptly and not later than settlement date, or at such earlier time payment may be demanded in accordance with the terms of this transaction and any applicable agreement(s), and that you don't contemplate sale of such securities prior to making such payment. If this transaction is a sale by you in a cash account and the securities described on this confirmation aren't already held in your account with us, we're acting upon your representation that you or your principal owns such securities, and it's agreed that you'll promptly and not later than settlement date deposit such securities with us. If full payment for the securities purchased by you in this transaction isn't received by us, or if securities sold by you in this transaction aren't delivered to us in proper form on or after the first trading day after settlement date, we may at our option cancel or otherwise liquidate this transaction without notice to you, and you'll be liable to us for any resulting loss, including, without limitation, all expenses, attorney's fees, and other costs incurred by us and interest thereon. For more details, please read your applicable agreement(s).

If this transaction is a purchase by you in a margin account, it's agreed that sufficient cash or acceptable collateral will be deposited on or before settlement date, or at such earlier time payment may be demanded to satisfy applicable margin requirements.

Provisions of agreements and contracts shall inure to any successor of Vanguard Brokerage Services® ("VBS"), a division of Vanguard Marketing Corporation (VMC), member FINRA and SIPC.

It's understood and agreed that all transactions are subject to the rules and regulations of the Securities and Exchange Commission, self-regulatory organizations, and the Federal Reserve Board and the rules and customs of the exchange or market (and its clearinghouse, if any) where executed. Any transaction executed in the over-the-counter market is subject to the Uniform Practice Code of the Financial Industry Regulatory Authority, Inc. (FINRA). It's further understood that all transactions with VBS are unsolicited. The name of the other broker or party and the time of execution will be furnished upon written request to VBS.

When issued: A short form of "when, as, and if issued." The term indicates a conditional transaction in a security authorized for issuance but not as yet actually issued. All "when issued" transactions are on an "if" basis, to be settled if and when the actual security is issued.

VBS doesn't receive compensation for directing order flow in equity or options securities. A detailed explanation of order routing practices will be provided to you on an annual basis. For additional information regarding order routing practices as well as the nature of our routing relationships, visit vanguard.com. VBS, upon written request, will provide information related to your orders that were routed for execution in the past six months. This information will include the venue to which your order(s) was

routed, whether the order(s) was directed or nondirected, and the time of the transaction(s).

If "average price transaction" is indicated on this confirmation, details regarding the actual execution prices are available upon request to VBS.  Because some executions receive sub-penny pricing, average prices may be slightly above or below the total execution prices as a result of the method by which the average is calculated.

Prices for trades on some fixed income securities have been truncated.  Complete price information will be provided upon request to VBS.

Certain clients may have a different pricing structure based on assets or activities in their accounts at VBS or its affiliates. VBS reserves the right to change or waive fees at our discretion, subject to notification in accordance with applicable laws and regulations.

Call features may exist for securities. Call features for fixed income securities may affect yield. Complete information will be provided upon request to VBS.

Zero coupons and multiplier securities are callable below maturity value without notice by mail to the holder unless registered.

The ratings that appear in the description of some fixed income securities have been obtained from ratings services which VBS believes to be reliable; however, VBS can't guarantee their accuracy. Securities for which a rating isn't available are marked "UNRATED."

If this transaction involves an asset-backed security, including a municipal collateralized mortgage obligation, which represents an interest in, or is secured by, a pool of receivables or other financial assets that are subject continuously to prepayment, then the actual yield of such security may vary according to the rate at which the underlying receivables or other financial assets are prepaid. Information concerning the factors that affect yield (including at a minimum estimated yield, weighted average life, and the prepayment assumptions of underlying yield) will be furnished upon your written request to VBS.

Mutual funds are offered by prospectus. Fees and charges imposed by the funds are indicated in each fund's prospectus. By purchasing a fund, you agree to pay any fees or charges listed in the fund's prospectus. For mutual fund transactions, VBS may receive other remuneration, the source and amount of which will be furnished upon written request. You may be eligible for breakpoint discounts based on the size of your purchase, current holdings, or future purchases. The sales charge you paid may differ slightly from the prospectus disclosed rate because of rounding calculations. Please refer to the fund's prospectus or statement of additional information for further information.

### Compensation to VMC
VMC receives reimbursements from The Vanguard Group, Inc., on behalf of the Vanguard family of mutual funds, for waived and discounted brokerage commissions and fees.

### Capacity in which VBS acted
VBS acted as your agent only and charged you a commission for its service unless the "Notes" section of the confirmation indicates a different capacity.  VBS may act as agent only, as principal, or as agent for the buyer and seller.

### Additional capacity information
If "average price transaction" is indicated on this confirmation, VBS  may have acted as principal, agent, or both, or agent for

---

Transactions in your account are confirmed subject to the terms and conditions listed above. This confirmation is a notice, not an invoice. Remittance or securities are due on or before settlement date.

Vanguard Marketing Corporation, Distributor of the Vanguard Funds.

# Vanguard®

another party on one or more exchanges. Details regarding the actual execution are available on request to VBS.

If your trade included fractional shares and was executed as part of an automatic investment plan, VBS acted as agent for the fractional shares. All other fractional shares were traded on a principal basis.

**Reporting instructions**
Report any error, omission, or exception immediately to:

**Vanguard Brokerage Services**
**P.O. Box 982901**
**El Paso, TX 79998-2901**

**S&P Rating Disclosure**
Copyright 2021, S&P Global Market Intelligence. Reproduction of S&P Credit Ratings ("Ratings") in any form is prohibited except with the prior written permission of S&P Global Market Intelligence (together with its affiliates, "S&P Global"). S&P Global does not guarantee the accuracy, completeness, timeliness or availability of any information, including Ratings, and is not responsible for any errors or omissions (negligent or otherwise), regardless of the cause, or for the results obtained from the use of Ratings. S&P Global shall not be liable for any damages, costs, expenses, legal fees, or losses (including lost income or lost profit and opportunity costs) in connection with any use of Ratings. Ratings are statements of opinions and are not statements of fact or recommendations to purchase, hold or sell securities. They do not address the market value of securities or the suitability of securities for investment purposes, and should not be relied on as investment advice.

Transactions in your account are confirmed subject to the terms and conditions listed above. This confirmation is a notice, not an invoice. Remittance or securities are due on or before settlement date.

Vanguard Marketing Corporation, Distributor of the Vanguard Funds.

# EXHIBIT 3



**EQUITY**
TRUST COMPANY®

Dusty Stanaway
1987 Ward Court
Hayes, VA 23072

February 9, 2024

Dear Dusty Stanaway,

We are writing to you because you have one or more self-directed IRA accounts at Equity Trust Company ("Equity Trust"), and our records indicate that you elected to purchase precious metals for your account(s) through Oxford Gold Group, Inc. ("Oxford Gold"), a precious metals dealer, and/or elected to sell precious metals in your account(s) to Oxford Gold.

This letter is to inform you that, as of February 6, 2024, Equity Trust has ceased doing business with Oxford Gold, and we have removed Oxford Gold as your Account Designated Representative/Precious Metals Dealer on your Equity Trust account(s). This does not impact your status as a client of Equity Trust, and unless you direct otherwise, we will continue to serve as the custodian of your account(s).

Further, our records indicate that one or more of your precious metals transactions with Oxford Gold for your Equity Trust account(s) have not been settled. What this means is that our records reflect that (i) the metals you purchased from Oxford Gold were not yet fulfilled and delivered to your designated depository, and/or (ii) that your Equity Trust account(s) has not received the cash proceeds from the precious metals that you sold to Oxford Gold. Please consult your latest quarterly statement for details relating to any unsettled precious metals transactions in your Equity Trust account(s), which can be retrieved by logging into your account at www.myEQUITY.com.

As the client that elected to purchase and/or sell precious metals from Oxford Gold for your account(s), you are responsible for working with your precious metals dealer to ensure those transactions are settled. Please contact Oxford Gold for further information regarding unsettled precious metals transactions. If any of the precious metals that you purchased through Oxford Gold have been settled and not sold back to Oxford Gold, as indicated on your account statement(s), those precious metals will continue to be stored at your elected depository.

If you would like to purchase precious metals in the future or sell any settled precious metals in your account(s), you will need to select a different precious metals dealer, as Equity Trust will no longer process transactions involving Oxford Gold. A list of precious metals dealers that Equity Trust works with can be found at this webpage: https://www.trustetc.com/investmentdistrict/. Please note that this is not an exclusive list, and Equity Trust neither recommends nor advises that its clients work with any particular dealer; clients must conduct their own due diligence when selecting a precious metals dealer to purchase or sell precious metals.

For any questions concerning the status of the assets in your Equity Trust account(s), please review your latest quarterly statement, which can be retrieved by logging into your account at www.myEQUITY.com. If you have questions concerning this letter, please contact us at 855-643-5506.

Thank you for being a valued client.

Equity Trust Company

*Equity Trust Company is a directed custodian and does not provide tax, legal or investment advice. Any information communicated by Equity Trust Company is for educational purposes only, and should not be construed as tax, legal or investment advice. Whenever making an investment decision, please consult with your tax or financial professional.*

Equity Trust Company | 1 Equity Way | Westlake, OH  44145 | 855-643-5506

*JoAnn*  2-14-24